# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 9, 2020　　　　Decided August 24, 2021

No. 19-1041

ROBIN S. MARCATO,
PETITIONER

v.

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT,
RESPONDENT

MERIT SYSTEMS PROTECTION BOARD,
INTERVENOR

---

On Petition for Review of an Order
of the Merit Systems Protection Board

---

*Kathleen McClellan* argued the cause for petitioner. With her on the briefs was *Jesselyn A. Radack.*

*Allison Kidd-Miller*, Assistant Director, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Jeffrey Bossert Clark*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Isaac B. Rosenberg*, Attorney.

*Tristan L. Leavitt*, General Counsel, Merit Systems Protection Board, *Katherine M. Smith*, Deputy General Counsel, and *Stephen W. Fung*, Attorney, were on the brief for

2

intervenor Merit Systems Protection Board in support of respondent.

Before: GARLAND,[*] PILLARD, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: A federal agency may defend an adverse personnel action taken against a whistleblower by showing that it would have taken the same action in the absence of any protected disclosures. In this case, the Merit Systems Protection Board found that the Office of the Inspector General (OIG) of the United States Agency for International Development (USAID) would have fired petitioner Robin Marcato for workplace misconduct in the absence of her protected disclosures. We conclude that substantial evidence supports this finding.

I

The Civil Service Reform Act permits federal employees to appeal certain adverse personnel actions, including removal from office, to the MSPB. 5 U.S.C. §§ 7512(1), 7513(d). To sustain a challenged action before the MSPB, the employing agency must show that the charged employee conduct occurred, *id.* § 7701(c)(1)(B); that the adverse action was necessary to promote the efficiency of the service, *id.* § 7513(a); and that the penalty imposed was reasonable, *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 299–300 (1981). *See, e.g.*, *Bryant v. Nat'l Sci. Found.*, 105 F.3d 1414, 1416

---

[*] Then-Judge Garland was a member of the panel when this case was submitted but did not participate in its final disposition. Judge Pillard and Judge Katsas have acted as a quorum for this opinion and judgment. *See* 28 U.S.C. § 46(d).

(Fed. Cir. 1997). The MSPB may not sustain an adverse action "based on any prohibited personnel practice described in section 2302(b)." 5 U.S.C. § 7701(c)(2)(B). As relevant here, section 2302(b) prohibits any adverse personnel action "because of" an employee's "disclosure of information" about unlawful activity, gross agency mismanagement, or similar conduct. *Id.* § 2302(b)(8)(A).

The Whistleblower Protection Act permits any federal employee subjected to a personnel practice prohibited by section 2302(b)(8) to "seek corrective action" from the MSPB. 5 U.S.C. § 1221(a). In such a case, the employee bears the burden to show that her protected disclosures were a "contributing factor in the personnel action." *Id.* § 1221(e)(1). The employee may discharge that burden through "circumstantial evidence," including evidence that an official took the personnel action shortly after learning of the disclosure. *Id.* If the employee carries this burden, the agency can nonetheless prevail by showing "by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." *Id.* § 1221(e)(2). Factors that the Federal Circuit has identified as pertinent to this defense include:

> the strength of the agency's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

*Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). This burden-shifting framework governs appeals to the MSPB under the Civil Service Reform Act, which can fairly be

4

described as a kind of "corrective action" for adverse personnel actions undertaken in retaliation for whistleblowing. Accordingly, on review of an MSPB decision under the CSRA, we must determine whether the MSPB correctly applied the Whistleblower Protection Act framework to factual findings supported by substantial evidence.

A party aggrieved by an MSPB decision may petition a court of appeals for review. 5 U.S.C. § 7703(a)(1). Until 2012, the Federal Circuit had exclusive jurisdiction over such petitions. *See id.* § 7703(b)(1)(A). Since then, the regional circuits have had concurrent jurisdiction over petitions challenging only the disposition of whistleblower-retaliation claims. *See id.* § 7703(b)(1)(B). Because we were given jurisdiction to review MSPB decisions only recently, we consult Federal Circuit precedent for guidance, as other regional circuits have done. *See Acha v. USDA*, 841 F.3d 878, 880 n.2 (10th Cir. 2016).

II

USAID administers the federal government's foreign development assistance program. *Hanson v. USAID*, 372 F.3d 286, 289 (4th Cir. 2004). The OIG is the Agency's oversight arm. Its components include an Office of Investigations, which conducts criminal and other investigations of grant recipients and others involved in the agency's programs, and an Office of Management, which provides support services to the OIG. In 2012, the OIG hired Marcato to the management office, where she worked as a management analyst.

During her tenure at OIG, Marcato frequently alleged misconduct by its high-ranking officials, including Acting Inspector General Michael Carroll, Deputy Inspector General Catherine Trujillo, Chief of Staff Justin Brown, and Deputy Assistant Inspector General Lisa McClennon. Beginning in

2012, Marcato reported within the OIG that officials had doctored various audits and reports sent to Congress. In 2013, Marcato repeated those allegations to Senate staffers, prompting a critical letter from Senator Coburn and unfavorable media coverage in the *Washington Post*. In October 2014, Carroll withdrew his nomination to be the Senate-confirmed Inspector General, and he retired from the OIG a few months later.

While routinely reporting the misdeeds of others, Marcato engaged in concerning conduct herself. In December 2014, she approached Rebecca Giacalone, an agent in the Office of Investigations, about an ongoing criminal probe on which Giacalone was working. The investigation concerned International Relief and Development, Inc. (IRD), which was Marcato's former employer and one of USAID's largest grant recipients. Marcato identified potential witnesses, including former IRD employee Dawn Greensides. After Marcato told Giacalone that Greensides would feel uncomfortable cooperating, Giacalone asked Marcato to vouch for her to Greensides as a trustworthy investigator. Marcato proceeded to send Greensides an e-mail that went well beyond the scope of Giacalone's request: Marcato identified the subject of the investigation, the name of a suspect, and the name of a cooperating witness, and she stated that the OIG was considering a subpoena for IRD files. No OIG employee reviewed the e-mail beforehand or learned of it until a year later.

Marcato became increasingly preoccupied with the IRD probe. She would seek to discuss it with Giacalone several times daily. Giacalone became uncomfortable because Marcato was not a trained investigator, and her visits were distracting. Giacalone relayed her concerns to her supervisors in the Office of Investigations, including McClennon.

McClennon passed on the concerns to Trujillo and Robert Ross, who supervised Marcato in the Office of Management. Trujillo and Ross then developed a protocol requiring Marcato to go through Ross if she wanted to speak to Giacalone or enter the Investigations workspace. In February 2015, Ross and Trujillo met with Marcato to explain the protocol. Marcato recorded the meeting on her cell phone, despite a USAID security policy barring the unauthorized use, in restricted workspace, of any device that can transmit audio or video.

The protocol failed to dampen Marcato's efforts to participate in the IRD investigation. Over the next month, Marcato e-mailed Giacalone three times to flag possible leads and to disparage the protocol as an "insulting waste of … time." J.A. 83. In March 2015, the Office of Investigations disabled Marcato's access to its suite, and Ross again instructed her to follow the protocol. Yet Marcato violated the protocol at least three more times in the next six months. On one occasion, she initiated a conversation with an investigator by standing on office furniture to speak over the top of a wall dividing the respective workspace of the Management and Investigations offices. On another occasion, she trailed someone into the Investigations suite, then walked past staff who tried to prevent her from entering.

In October 2015, Ross proposed to reprimand Marcato for her repeated violations of the protocol. In response, Marcato attached her e-mail to Greensides, which prompted concern over its disclosure of sensitive information. Around this time, Trujillo learned that Marcato had recorded their February 2015 meeting. According to Trujillo, newly confirmed Inspector General Ann Calvaresi Barr decided to investigate Marcato's conduct, including her e-mail disclosure, cell phone recording, and failure to follow the communications protocol. To avoid any conflicts of interest, Calvaresi Barr arranged for the OIG

of the Department of Defense to conduct the investigation. In the formal, written request for assistance, Trujillo noted the "sensitivity" of the investigation given that Marcato "self-identified as a whistleblower" and had recently made disclosures to Congress of alleged misconduct by high-ranking USAID officials. J.A. 62. Trujillo requested DoD's help to ensure that the allegations against Marcato were "appropriately investigated." *Id.*

The ensuing investigation consumed over a year. In an interview, Marcato informed DoD investigators that, at the beginning of her February 2015 meeting with Ross and Trujillo, she told them that she would be recording the meeting with her cell phone, which she visibly placed on a table. Marcato made similar statements to the USAID security office. Ross and Trujillo both denied that Marcato told them she would be recording the meeting.

The DoD OIG finished its probe in June 2017. Its report substantiated four instances of misconduct. First, Marcato improperly disclosed sensitive information about an ongoing investigation to Greensides. Second, Marcato violated USAID's security policy by recording the meeting with Ross and Trujillo on her cell phone. Third, Marcato made false statements claiming that she told Ross and Trujillo that she would be recording the meeting. Fourth, Marcato repeatedly violated the communications protocol.

Debra Scott, Marcato's direct supervisor at the time, reviewed the report and proposed that Marcato be removed based on these charges. Jason Carroll,[1] who had replaced Ross as the Assistant Inspector General for the Management Office, then removed Marcato. Scott outlined four charges matching the instances of misconduct substantiated by the DoD OIG,

---

[1] No relation to former Acting IG Michael Carroll.

specifically noting that the disclosure to Greensides "could have jeopardized the integrity" of an ongoing criminal investigation and that "knowing falsification in any official investigation or inquiry strikes at the heart of the employee-employer relationship and OIG's core mission." J.A. 22. Carroll stated that his confidence in Marcato had been "irreparably damaged." *Id.* at 11.

Marcato appealed her removal to the MSPB. After a four-day evidentiary hearing, an administrative judge sustained the decision. He concluded that Marcato committed the charged conduct, that her removal promoted the effective functioning of the agency, and that the penalty of removal was reasonable. The judge then turned to the question of whistleblower retaliation. Based on circumstantial evidence, he found that retaliation was a contributing factor in Scott's decision to propose removing Marcato and in Jason Carroll's decision to remove her. But the judge then found, by clear and convincing evidence, that the OIG would have removed Marcato even in the absence of any protected disclosures.

Marcato did not ask the full MSPB to review the judge's decision, which became the Board's final decision by operation of law. 5 C.F.R. § 1201.113. Because Marcato now contests only the decision on her retaliation claim, we have jurisdiction over her petition for review under 5 U.S.C. § 7703(b)(1)(B), which applies to the disposition of whistleblower-retaliation allegations raised either as stand-alone claims under the Whistleblower Protection Act or as affirmative defenses under the CSRA. *See Baca v. Dep't of the Army*, 983 F.3d 1131, 1137 (10th Cir. 2020) (noting that § 7703(b)(1)(B) "does not differentiate between whistleblower actions raised as direct claims and those raised as affirmative defenses").

9

III

Marcato disputes whether USAID proved by clear and convincing evidence that it would have removed her had she not made any protected disclosures.  The clear-and-convincing standard requires "reasonable certainty of truth."  *United States v. Montague*, 40 F.3d 1251, 1255 (D.C. Cir. 1994) (cleaned up).  We review for substantial evidence the administrative judge's determination that USAID met its clear-and-convincing burden.  *See* 5 U.S.C. § 7703(c)(3); *Greenspan v. Dep't of Veterans Affairs*, 464 F.3d 1297, 1306 (Fed. Cir. 2006).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  In reviewing the evidence, we will consider the factors set forth in *Carr*, 185 F.3d at 1323, as did the administrative judge.

A

The first *Carr* factor is "the strength of the agency's evidence in support of its personnel action."  185 F.3d at 1323.  The stronger the evidence, the more likely the agency would have taken the personnel action.  Here, the judge reasonably determined that Marcato's removal was supported by "strong evidence" of significant workplace misconduct.  J.A. 723.

*First*, Marcato sent a highly inappropriate e-mail to Greensides, a potential witness in an ongoing criminal investigation.  On its face, the e-mail discloses sensitive information about the investigation, including the subject of the investigation, the name of a suspect, the name of a cooperating witness, and information about a potential subpoena.  OIG officials testified that these disclosures could have compromised the investigation.  Marcato's only response is that Giacalone asked her to send an e-mail to Greensides.  But Giacalone asked Marcato only to vouch for her to Greensides

as a trustworthy investigator; Giacalone specifically denied authorizing Marcato to disclose the details of the investigation. The administrative judge plausibly found Giacalone's testimony to be credible, and we cannot set aside that "virtually unreviewable" assessment. *King v. HHS*, 133 F.3d 1450, 1453 (Fed. Cir. 1998) (quoting *Clark v. Dep't of the Army*, 997 F.2d 1466, 1473 (Fed. Cir. 1993)).

*Second*, Marcato violated a USAID security policy by recording her February 2015 meeting with Trujillo and Ross on a cell phone. The policy prohibits using "devices which transmit audio or video" in restricted areas without the advance permission of the Agency's security office. J.A. 428. The meeting was held in OIG workspace prominently marked as restricted, and it was undisputed that Marcato did not receive advance permission. Marcato objects that the USAID security office, in a February 2016 warning letter to her, stated that it could not determine whether she had violated the policy. But that was because Marcato refused to tell the security office "what type of device was used for these audio recordings." *Id.* at 81. Marcato later admitted to recording the meeting on her cell phone, in testimony before the DoD investigators and the administrative judge.

*Third*, the false-statements charge was amply supported. While under oath, Marcato told DoD investigators that she had announced to Trujillo and Ross that she would be recording the February 2015 meeting with her cell phone, which she visibly placed on a table. Marcato also made similar statements to the USAID security office. But after Trujillo and Ross testified to the contrary, Marcato claimed not to "remember the details of the meeting." J.A. 619. And when asked to reconcile that position with her prior statements, she explained that she "said what was true to [her] at the time." *Id.* at 620. The administrative judge found the testimony of Trujillo and Ross

to be more credible than Marcato's, and we have no reason to second-guess that assessment. *See Pope v. USPS*, 114 F.3d 1144, 1149 (Fed. Cir. 1997). Marcato objects that Trujillo was biased and gave allegedly inconsistent testimony. But on the issue of the recording, Trujillo's testimony was internally consistent and matched Ross's testimony. Marcato further contends that her false statements were not chargeable because she did not intend to mislead the agency for private material gain. Marcato forfeited that argument by not raising it until her reply brief. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008). The argument is also meritless; the administrative judge could reasonably infer an intent to mislead from the circumstances, and preventing the imposition of discipline surely qualifies as a private gain.

*Fourth*, Marcato repeatedly violated the communications protocol by initiating discussions with the Office of Investigations. Marcato highlights Ross's testimony before the administrative judge that he disagreed with the protocol and did not think that Marcato needed to follow it. But Ross never suggested to Marcato that the protocol was optional. Rather, in the February 2015 meeting, Ross and Trujillo instructed Marcato to follow the protocol, and Ross's notes document several later reminders. J.A. 89 (Mar. 12) ("I instructed Robin not to initiate any discussions with IG/I staff regarding their work."); *id.* at 88 (Aug. 25) (same); *id.* at 85 (Sept. 22) ("I am directing you not to enter the Office of Investigations space unless authorized by me."). And as the judge explained, Ross's "disagreement" with the protocol did not justify Marcato's "refusal to follow" her supervisors' instructions. *Id.* at 714.

B

The second *Carr* factor is "the existence and strength of any motive to retaliate on the part of the agency officials who

were involved in the decision" under review. 185 F.3d at 1323. Those involved in the decision include the decisionmaker and "other agency officials who influenced the decision." *Whitmore v. DOL*, 680 F.3d 1353, 1371 (Fed. Cir. 2012) (quoting *McCarthy v. Int'l Boundary & Water Comm.*, 116 M.S.P.R. 594, 613 (2011)).

1

Marcato contends that the administrative judge improperly required her to prove the second *Carr* factor. But the factors are "merely appropriate and pertinent considerations" in "determining whether the agency carries its burden of proving by clear and convincing evidence that the same action would have been taken absent the whistleblowing." *Whitmore*, 680 F.3d at 1374. Here, the judge correctly stated the governing rule that, if the employee proves that protected activity was a "contributing factor" in the adverse personnel action at issue, "the agency must prove by clear and convincing evidence that it would have taken the same action even absent the disclosure or other protected activity." J.A. 719; *see* 5 U.S.C. § 1221(e). Then, in applying the rule, the judge concluded that USAID "has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing or protected activity." J.A. 722. The judge summarized the motives and testimony of the DoD investigators and the USAID officials involved in Marcato's removal in its analysis of the second *Carr* factor, and it weighed that evidence against evidence bearing on the other *Carr* factors—including what he characterized as "strong" evidence of significant misconduct. *Id.* at 723. After doing so, the judge restated his conclusion: "I find that the agency has proven by clear and convincing evidence that it would have removed the appellant even in the absence of her disclosures."

*Id.* at 726. This analysis correctly applied the burden-shifting framework of the Whistleblower Protection Act.

Marcato highlights the judge's statement, in addressing the second *Carr* factor, that she "failed to show retaliatory motive." J.A. 724. But the judge had already found that Marcato's protected activity was a "contributing factor" in the termination decision, based on "circumstantial evidence" that Debra Scott and Jason Carroll removed Marcato while they knew about at least some of her disclosures. *Id.* at 720–22. In analyzing the second *Carr* factor, the judge made clear that there was no *other* evidence of retaliatory motive: Marcato's disclosures involved neither Scott nor Jason Carroll; Scott testified about instances in which she had supported Marcato's whistleblowing activity; and Carroll credibly testified that he made the decision to remove Marcato without any pressure from his OIG superiors. *Id.* at 724–25. In context, we understand the judge to have concluded that there was no evidence of retaliatory motive beyond the circumstantial case based on knowledge and timing, which made the evidence of retaliation relatively weak compared to the strong evidence of misconduct. *See Kewley v. HHS*, 153 F.3d 1357, 1364–65 (Fed. Cir. 1998) ("Once the agency presented its evidence in support of its charges of independent causation for the removal, [an employee must] rebut the agency's evidence or risk a finding that the agency had successfully established its affirmative defense …."). While the judge's language on this point was perhaps imprecise, we have no doubt that he held USAID to its ultimate burden to prove by clear and convincing

evidence that it would have fired Marcato regardless of her disclosures.

2

The administrative judge reasonably assessed evidence about the motives of the officials involved in the decision to fire Marcato. As the judge explained, Marcato had made no allegations of wrongdoing against either the proposing official (Scott) or the removing official (Jason Carroll). Nor were Scott or Jason Carroll otherwise caught up in the congressional or media scrutiny that followed her disclosures. Moreover, the investigation leading to Marcato's firing was done by an outside agency—the DoD OIG—and nothing suggested that its investigators "were influenced by retaliatory animus." J.A. 724. On review, Marcato does not even suggest such animus by Scott, Jason Carroll, or the DoD investigators.

Marcato instead focuses on other USAID officials with an alleged motive to retaliate—Michael Carroll, Trujillo, McClennon, and Brown—but she provides no evidence that any of them influenced the removal decision. Michael Carroll retired before Marcato engaged in much of the misconduct investigated by DoD. Trujillo left the agency nine months before the removal decision and testified that she did not influence the DoD investigation or the USAID removal decision. McClennon never supervised Marcato and attested that she never discussed Marcato with Jason Carroll. Brown had no connection to Marcato beyond forwarding the DoD report to Scott and Jason Carroll, and he testified that he never discussed the substance of it with them. Scott and Jason Carroll corroborated the testimony of Trujillo, McClennon, and Brown on all of these points.

Marcato primarily contends that USAID initiated the DoD investigation because of her protected activity. That assertion

has several problems. First, Marcato's own misconduct—disclosing obviously sensitive information about an important, ongoing criminal investigation to a prospective witness—provided ample basis for the investigation. Second, according to Trujillo, the investigation was ordered not by Trujillo, as Marcato contends, but by Calvaresi Barr, whom Marcato does not allege to harbor retaliatory motives. Third, the proposed reprimand leading to the discovery of Marcato's unauthorized disclosures was issued by Ross, whom Marcato describes as her ally within USAID. Marcato stresses that USAID outsourced the investigation to DoD because of her whistleblower status. But she fails to explain why enlisting the help of an outside agency to investigate serious charges, rather than conducting the investigation through in-house investigators who might more readily be perceived to have an interest in its outcome, should count against USAID here.

Alternatively, Marcato invokes what she describes as Trujillo's retaliatory decision to devise the protocol and impose it on her over Ross's objection. The governing statute prohibits any "personnel action" taken "because of" protected whistleblowing activity. 5 U.S.C. § 2302(b)(8). And the governing proof scheme makes the agency liable if the prohibited consideration was a "contributing factor" in the challenged action, unless the agency shows that it "would have" taken the same action anyway. *Id.* § 1221(e). The Supreme Court construed a similar scheme prohibiting adverse employment actions because of the employee's military service in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). Invoking background principles of proximate cause and agency law, the Court held that an employer is liable if one of its agents intends to cause the adverse employment action, acts for the prohibited reason, and is a proximate cause of the adverse action. *See id.* at 419–21. So, for example, an employer may be liable if one of its employees, for prohibited reasons, successfully persuades

a neutral decisionmaker to terminate another employee.  *See id.* at 413–16.

This case does not fit that model.  Marcato's alternative theory posits that the retaliatory February 2015 protocol caused Marcato's ensuing violations of it, which caused Ross to issue his proposed reprimand, which caused Marcato to reveal her past misconduct disclosing sensitive information, which caused the DoD OIG investigation, which caused her September 2017 removal.  But the protocol merely required Marcato to obtain permission from her supervisor before straying outside her lane in the management office; that kind of modest restriction does not plausibly reflect an intent to orchestrate an ultimate termination.  Moreover, the protocol was temporally and causally remote from the removal, separated by Marcato's intervening decisions (1) to provoke repeated confrontations rather than asking Ross to approve her continued contact with Giacalone and (2) to reveal evidence of significant, previously unknown misconduct regarding her unauthorized disclosure of sensitive information.  Given the length of this chain, and the unforeseeable twists and turns within it, the imposition of the protocol cannot be considered a proximate cause of the termination decision.  *See, e.g.*, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (proximate cause demands "some direct relation between the injury asserted and the injurious conduct alleged" (quoting *Holmes v. Sec. Invs. Prot. Corp.*, 503 U.S. 258, 268 (1992)).

For these reasons, the administrative judge permissibly declined to put much weight on either the decision to impose

the communications protocol on Marcato or the decision to investigate her through DoD.

## C

The third *Carr* factor considers whether the agency has taken "similar actions against employees who are not whistleblowers but who are otherwise similarly situated." 185 F.3d at 1323.

The administrative judge reasonably found this factor to favor USAID. Its Table of Offenses and Penalties lists both making a false statement and violating a security regulation as removable offenses. Moreover, a human-resources official for USAID OIG testified that several employees who had made false statements were removed or resigned in lieu of removal, and the official did not recall that any of them were whistleblowers. Marcato presents examples of non-whistleblowers who were not punished for misconduct, but none of them was similarly situated to her.

## IV

After reasonably weighing the *Carr* factors, the administrative judge concluded that USAID met its burden to show, by clear and convincing evidence, that it would have fired Marcato regardless of her protected activity. Because substantial evidence supports the judge's decision, we deny the petition for review.

*So ordered.*